WHITE BUFFALO CONSTRUCTION v. U.S., Mr. Kaplan, whenever you're ready. Good morning, Your Honor. May it please the Court, I'm Scott Kaplan for Appellant White Buffalo. We have before the Court essentially three separate but related matters. There is the Court of Federal Claims dismissal of White Buffalo's at-faith claim on the merits, and we also have a couple of damages issues on the merits. We have the dismissal of White Buffalo's 1999 and 2000 cases on the basis of mootness. And we have the government's cross-assignment of error of the Court of Federal Claims' denial of the motion to dismiss on jurisdictional grounds. While jurisdiction is, of course, a predicate to getting to the merits of the bad-faith claim, I'd like to suggest that because the grounds of the Court of Federal Claims' denial of the motion necessarily were factual, in that there are questions about when the claim approved and on the application of the discovery rule, that the government would need to show that those rulings were clear error. Well, did the trial court actually rule on accrual or discovery rule? I didn't see his ruling as having been directed to the point that was made in the government's motion to dismiss on those two issues. Can you point us to what the court had to say about that, indicate that he did rule, that he did make a finding with respect to either accrual or discovery? I can't, Your Honor, because the Court of Federal Claims didn't explain the rationale for the denial of the motion. Where in the appendix is the place where the court rules on that motion? Do you have that readily at hand? I don't want to take up your time looking for it. I do have that site, Your Honor. There is a one-page order, and I believe it's A279. And as I recall, it just says the motion is denied. But somewhere, and I don't have the right site for it, I have a quote that says there may be some potential question of jurisdiction. It seems to me the better answer is there is jurisdiction to hear this material and make a decision on it. I don't know exactly where that appears. Do you have it, Your Honor? I don't, Your Honor. And it may be there was also the mootness issue. And it may be the court decided that, and I think correctly, that mootness couldn't be determined until after a trial, or for reasons I'm happy to talk about. But as far as subject matter jurisdiction, the way the case was framed was that if the claim was made either in our view of the world in the fall of 2004, in the government's view of the world in January 2005, the termination was December 1998. If the government's view of the world is correct, and if there are no issues of accrual and no discovery rule, then the January 1995 claim was late. So in order for the motion to have been denied, there had to have been a finding either that, A, the claim was made later, or, B, it accrued later. Now, the filings from the fall of 90, I'm sorry, the fall of 2004, I guess it is, that you rely on seemed to me when I looked at them to be in the nature of saying that we will be filing a claim, not that this is our claim. That's correct. So that, while it may have alerted the government to the possibility that such a claim would be forthcoming, that isn't a claim itself, right? It put the government on notice. Right, but that's not what's required in order to trigger the six-year, right? You're right, Your Honor, and we don't rely on those. Okay, so you really rely on the January 2005, which is, I don't know why people wait six years and one month, but that's what happened. And so you need the discovery rule to come to your aid, right? We need the discovery rule to come to our aid in that all events is in part, but the second part is that part of the events that constitute the claim hadn't occurred until the completion contractor did the work in 1999. And that is based on your theory that the preferable treatment given to the completion contractor is part and parcel, not only indicative of, but part and parcel of the bad faith. Is that the essence of your claim? Correct, Your Honor. That's the heart of our case based on the Keter case and on the recent TigerSwan case, which follows along with it. But that is the heart of our case. And if we look at the events that triggered the discovery, there were several. First of all, there was discovery in the litigation. Then there was a survey that White Buffalo commissioned in 2002, which showed in part that the government had paid the completion contractor for work that wasn't done or that was done by White Buffalo. And it also confirmed the design change that wasn't disclosed until White Buffalo made a FOIA request. And in that request, it uncovered documents to the effect that we better not make the design change in the contract for the completion contractor because we don't want that to be grounds for termination for convenience. So there was an affirmative effort to keep quiet about the design change, and we think that invokes equitable tolling when you have those sorts of events. And in the discovery, in the litigation, for example, we obtained the files of the government inspector. It was a contract inspector, not a government employee. And in those files, we discovered that the resident engineer who we maintain had usurped the role of the project engineer had gotten irrationally upset, I believe were the words, when the inspector tried to assist White Buffalo in actually getting the work done. And we also uncovered evidence that this resident engineer was assigned to projects when you want to get rid of a contractor. And now I understand that this is an unusual situation, and that it's not the kind of thing the court sees every day. And we wouldn't have pursued this for 15 years now if it wasn't an extremely unusual situation where we have affirmative evidence that because the resident engineer favored another contractor and the record is replete with notifications to the contracting officer and to his superiors that these other guys, Tidewater, they're great, they're competent, but these White Buffalo people, they're incompetent. And that was basically only a couple of weeks after the work started. And there were continual references to the favored contractor, Tidewater. And there were also references to the prior litigation that White Buffalo had with Forest Service who was Federal Highway Administration's clienteer to the effect that White Buffalo's president was told, it was kind of as a vulgar remark that I won't repeat here, it's in the record, but it was that you better watch out, they're going to get you. So you better settle that other case. So we really have affirmative evidence of an animus here. But the problem, as I'm sure you recognize, is that everything you've been saying is highly factual. It was before the trial court who held the trial in this case, heard from the witnesses that we haven't got before us, all we have is a cold record. And found squarely against you on the question of bad faith with findings of the credibility and ultimately the good performance of the resident engineer. How do you overcome those kinds of findings? A few things, Your Honor. But first, this relates to the court's question on the jurisdictional issue because it's so hard to meet this burden. There can't be a hair trigger on the accrual of the claim. Let's assume that you're right about jurisdiction. Let's assume we read Judge Smith's very brief statement as encompassing a finding that there was either later accrual or equitable claim. But on the merits of the bad faith issue. And I do recognize that we have a high burden, but what the court, in fact, didn't address the two key reasons why we think the court was wrong. Number one, the whole disparate treatment issue simply wasn't addressed. And I can go through the evidence there if the court likes, but it's just not addressed in the opinion. And number two, White Buffalo argued strenuously that a presumption ought to be applied here because critical people under the control of the government, including the project engineer, weren't brought to trial and were not available to White Buffalo. The project engineer was in Baltimore. The trial was in Portland. There was no way to subpoena him. They were available by deposition. They were available by deposition. And they were deposed, I think, right? They were deposed. They were deposed. But the problem was that White Buffalo argued that Mr. Rettinger usurped the role of the project engineer. And Mr. Rettinger's explanation was, gee, well, his English wasn't very good. He was kind of a newbie. He didn't know what he was doing. And Mr. Rettinger was there in person to, for example, talk about that the project engineer's English wasn't very good. And the Court of Federal Claims didn't have the engineer there so that the court can determine that himself. And, for example, the project engineer specifically said, I don't know why Mr. Rettinger is so strict on this project. He's not strict on other projects, which we think is kind of prima facie evidence of disparate treatment. Mr. Rettinger was there to try to explain that away. The project engineer wasn't there so that the court could evaluate his credibility. The same issue was for Carol Jacobi, who was not sure of her exact title, but she was the head of the Western Regional Office for the Federal Highway Administration. She was the one who made the determination that we should keep quiet about the design change so that it's not a T for termination for convenience. She was the one who the contracting officer reported to. And we didn't have the opportunity to question her at trial and to have her credibility evaluated on that, why were you not disclosing this termination for convenience basis, and why did White Buffalo have to get that information by making a FOIA request? That incidentally, they only got the documents after having to sue under FOIA. And we believe that particularly with regard to Mr. Aftab, the engineer, a presumption should have been applied that his testimony would have been unfavorable to the government and that his credibility would have been at least as great as Mr. Rettinger, who was made available to testify. You know, that would be a rule, it seems to me, of sweeping consequence, because in civil cases, as you very well know, there are limits on subpoena power that don't exist in criminal cases, but you'd be saying that any time one party has obtained testimony from a witness that's within the control of the other party that party A thinks is favorable, but wants that party to have that witness present in court, that there'd be a presumption. That would apply to, it seems to me, about a third of all civil cases, wouldn't it? Well, a few things. It comes up a lot. It comes up fairly often, but in this case, it was the central witness in the case, and it was the central witness not subject to subpoena at trial 3,000 miles away from where this witness was, and it was a witness that the government easily could have made available at the trial. I just have to ask you a housekeeping question, which is why on this $30,000 issue, the $29,000 issue with regards to the subcontract, why you all didn't file a motion for reconsideration before the trial, CFC? We could have, Your Honor, and frankly, I don't know the history to it, and we may be able to do it after this court's decision, depending on what the court does. But aside from that possibility, the one-year clock has run on doing that, and we do think it was clear error for the trial court to make factual findings and then not include the necessary ramifications of those findings in the judgment. Good morning. Thank you. May it please the Court. On the issue of the witnesses, they did testify. They testified through deposition. This issue did not even come up until after the trial was over. If we had been asked to bring Mr. Aftab to Portland, we would have done that. We could not have done that with Ms. Jacoby. She died in 2000. This is not something – this is only something I alluded to in the post-trial briefs because I had no evidence. I didn't have the death certificate entered into evidence at trial because this never came – because it never came up. More importantly, though – You say there was no request at trial to have Mr. Aftab present for the hearing? No. He – we – No request from the white level? Right. He was on their witness list. We counter-designated deposition transcript excerpts, and that, as far as I knew, would have been the end of it. I didn't even learn that Ms. Jacoby was deceased until after the trial. Moreover, they – those people did not terminate the contract. Mr. Parsons terminated the contract. His testimony also was in the trial through deposition. He was not even employed by the government at the time of trial, so he was equally available to – equally available to everybody. Can I – if you're finished at that point, can I ask you to comment on the jurisdictional question that you argued, something like – and specifically, could you address the question of whether Judge Smith has, albeit rather tersely but nonetheless sufficiently made a determination that the filing of the claim was timely? Well, because there are – It was a heavily factual determination, ultimately. Right. Well, because there are three – these are three actions consolidated for trial – We're talking about the bad faith issue. The bad faith one. Right. The only reference in the opinion to that is that Addendum 3 – no, I'm sorry, Addendum 2, footnote 3, in which Judge Smith holds that the court finds that White Buffalo failed to demonstrate that the government acted in bad faith. As such, the court dismisses the government's arguments. I'm sorry. Can you just point us to where on that page? Yes. It's Addendum 2, the second page of the opinion in footnote 3. Okay. So the trial court is saying there that because White Buffalo failed to demonstrate bad faith, the court dismisses the government's jurisdiction arguments as moot, suggesting that because we won on the merits, there was no reason to address the jurisdictional issue. Now, I didn't catch the full record number that Mr. Kaplan provided. I think he said 8779, which I'm not sure it does say. I don't know that that's – Well, if it's in the appendix, I could – if that's what he was talking about. Okay, so there it is. I remember this. So what I understood to be going on was Judge Smith did not find – make factual findings or even a jurisdictional determination on an accrual timeliness issue, but was saying that because at the time he thought the trial would last five days, we would just defer all that. So I don't see anywhere where the trial court made factual findings. Yeah, I think you're right. There were no explicit factual findings. There was a point, and I believe there was a different point from the order that the opposing counsel called their attention to, which the judge said in a rather perfunctory fashion, well, I think we have jurisdiction or something to that effect. There is a statement. I don't know where it is now, but there's a potential question. It seems to me the better answer is there is jurisdiction. Yeah, that's to the statement that I'm – Well, the court can look at that – if the court infers from that factual findings, then the court can determine that they are – that the factual finding is clearly erroneous, and it is because White Buffalo didn't have to know every last thing in order to bring a bad faith termination claim. In fact, its claim is about contract administration. Some of it, yes, was after the end of the contract, when the contract was terminated. But the problem we have, just as a process kind of thing, is if we agree with you that this isn't – you're saying we can find it was clear error or that he abused his discretion, but we don't really – at best we have this statement. So why wouldn't the better, more prudent course be for us to send it back to the trial judge to make findings so that we'll have findings to review? That's not something that I don't think anyone really would embrace as the best solution, but why isn't that what we're left with? Because that 1998 letter that White Buffalo sent to the contracting officer before termination in response to the cure notice has almost – has the majority, the vast majority of what their bad faith claim is. So that's when their claim accrued, and that's what happened in John Sands, John Sands and Grout, where that plaintiff sent a letter threatening to sue, listed reasons, the court of claims held that that was the date that their claim accrued. So it was when they wrote that letter, their claim accrued because they were aware of the things that became the nexus of their bad faith claim. So the claim couldn't accrue before the default termination, right? I mean – No. Yeah, so it wasn't until December. Right. Where the default termination occurred. Well, it's – we can look at it two ways because their bad faith claim is about bad faith contract administration. They never actually say that Mr. Parsons terminated the contract as a pretext or otherwise for an improper motive. So they did know in November 1998 that they had a bad faith contract administration claim. Right, but their knowledge had no on-the-ground consequences until the default termination, right? I mean it – Right. I mean they weren't claiming that the bad faith increased their performance cost. Their claim ultimately is they were not permitted to complete this contract. Right, so at the very latest their claim accrued on December 1, 1998 when the termination happened, and at least they say because of the reasons, most of which can be read in that November 1998 letter. So it was clearly erroneous for the court not to dismiss that for lack of jurisdiction because they knew of all those things more than six years before they submitted that January 2005 claim. And so – No, but I wonder. I mean it seems to me there is some force to the argument that – at least enough force to make me wary of saying that the judge, if he made those findings, was clearly erroneous. In saying that it's one thing to have a contracting officer or an agent of the government who's treating you badly. You can assume that they treat everybody badly and that's just – they're a sourpuss. But it's another thing to say, ah, they treated us really badly. But then they treated somebody else very differently and very favorably, and that suggests some animus that the unilateral bad treatment might not – why isn't that a legitimate ground to say that it wasn't until they found out about the alleged better treatment of Tidewater and Company that they really knew enough to say – To make the rather bold statement that this is a bad faith contract administration. Because one can read in their claim, in that third case, how they articulate it, is that the bad faith is the failure – is the lack of facilitation of cooperation. A subset of that characterization is the disparate treatment after the termination. But it doesn't make logical sense to say that the government failed to cooperate with us during performance by disparately treating a follow-on contractor better than they did during performance. You're right. That would not make logical sense. But what would, it seems to me, make logical sense is to say that we recognized once we discovered the later better treatment of the follow-on contractor that there was a reason for our bad treatment and that reason was animus against us. That's a different – it's a slightly different point, but it still brings that evidence into relief as important evidence for purposes of establishing an accrual date or at least a discovery rule extension period for filing. Right. And if that's how they brought – if that's how they treated their claim, then I'd have a much more difficult argument. But that's not what they're saying. They said that they knew from the beginning that they were being not treated well, that their project schedule was not being treated correctly, that the notice to proceed was too late, that the extension permit request was not handled properly, and all those things they told the contracting officer in November 1998. They have another reason now that they learned, but that's additional. And the Japanese war notes case that they cite in their brief says that they don't – a plaintiff doesn't need to know every last thing. He doesn't need to – he gets to flesh it out later. I think that the term flesh it out is in the Japanese war notes claim. So that once they know that they have a problem, and they say in that letter, problems with Mr. Redinger are slowing down this – slowing down our progress, and they actually say that he is intent on not seeing this completed timely. So that does bring in his motive. That does bring in that they – and they knew all along that, at least in their mind, he was their nemesis on this job. So just because they got confirmation of that in their view later because of what happened after termination does not mean that they did not know about this claim more than six years before they brought it. Is it crystal clear that the six-year period is jurisdictional? Well, by that, Your Honor, it means it can't be told. No, no. I mean something can be jurisdictional, but it's still subject to equitable tolling as the Supreme Court has told us. But is it still jurisdictional in the sense that if a finding is not made of equitable tolling, that that's it. It's not simply a timing mechanism which can be passed over in favor of the merits. But it deprives the particular claim subject to jurisdiction. Well, England suggests that it is jurisdictional because it's a jurisdictional prerequisite that a claim be presented and that – But presented timely. Right. Yes, it is jurisdictional. I mean the Alaska native case actually that I wrote had some language in it that suggested it's jurisdictional, but that wasn't the focus of the case. And I just wonder if we have any other cases that just nail that down. I don't know, and I don't remember having read Alaska. But on tolling, of course, Arctic Slope says that that presentment requirement can't be told. But the only – just because we're talking about this now. That's actually the same case. Arctic Slope. Oh, Arctic Slope. But you're right, and the question is – I don't remember what the court said on that. But just because we're on this, on the tolling of the 12-month appeals, I haven't seen anything since Irwin on that. But this court has the Burroughs case that says that no exceptions can be read into that 12-month period, which goes to whether they can even challenge the conversion decision on authority or some other type of grounds. But Judge Smith's findings that White Buffalo failed to demonstrate bad faith and that the basis for the termination for default is in White Buffalo's actions are not clearly erroneous. After all, they did not complete those repairs to subgrade to that milepost by the date they were supposed to have done, and they don't even say that Mr. Rettiger was responsible for that. And Judge Smith, on addendum page 21, lists many reasons, even aside from the differing site condition, for that failure to complete on time. So it's ironic because if they're correct that the conversion was a nullity and didn't happen, then they actually lose this entire case because Judge Smith, in effect, sustained the termination for default, in which case they're not entitled to any recovery under the termination for convenience clause. Your Honor, because you... Were you about to address the $0.20? Yes. $1,500. Right. So it was an oversight. Judge Smith meant to put that in the judgment, but it's within the court's discretion to affirm that judgment amount based upon anything that's supportable by the record, even if the parties hadn't brought it up, which is what L. Sheik says, and the termination for convenience clause, which is the basis for recovery for that, simply doesn't cover that. That was a pass-through claim. That can be seen on A8606. It's not a cost either to White Buffalo of the work because they never paid McBride. Don't we have to file a cross-appeal on that issue or something? No. Procedurally, we can just take it up and say it was wrong? Yes, because we're not asking for an alteration of the judgment. Because the judgment left it out. So it's within the court's discretion. There are reasons why the court could agree with us, but it's within the court's discretion. That was a contingent payment. That's on 11437. They say that we'll pay McBride if we get paid. What about the issue of EJ attorney's fees? Well, that's one of the reasons, frankly, why we're pushing for vacater and instructions to dismiss the first two cases. EJ was a reason. We did what they asked us to do, did what they asked the court to do. We converted and returned the liquidated damages in part so they wouldn't be a prevailing party. We made the business decision that that was the best thing to do. So you're saying they're not entitled to EJ fees? Right. Because they're not prevailing? Right, they did not prevail, but I do not want the United States to have to keep litigating that issue. A party, if it voluntarily acquiesces to all the relief that the court could grant, should get the benefit of the end of that litigation. We did that in 2004, and we are still litigating whether those two cases are removed. And, by the way, they've enjoyed the benefit of the $101,000 that we sent back in the form of liquidated damages. And we have not had the benefit of having put those two cases, we thought, to rest. Lots of what we tried in Portland over those three weeks had to do with that first case, all the different site conditions and stuff. Even the liquidated damages return, I had to prove in my post-trial brief, I mean I felt compelled to prove it, that we had paid the money back. We should never have had to talk about those first two cases after we moved to dismiss in 2004, having done everything the court could have done. And, by the way, they say that they had an equitable adjustment claim in that first case. Well, they do, but the court had no jurisdiction to give them any money in that first case because they had not even yet presented any claim for money to the contracting officer. So we did everything the court could have done, the trial court could have done in those two cases. In those cases, the court should never have entered a judgment, a money judgment that lists all three of those cases. Now the court agreed with us that the clerk should amend the judgment to say that the money judgment is only part of the third case, but even that didn't get done.  On the profit issue, your honors, the clause says that any reasonable method of calculating profit is permitted. That is an abuse of discretion issue because it goes to methodology, not the type of profit that would be awarded, and that's what home savings says. So it was perfectly reasonable for Judge Smith to look at, and we urged it, but he adopted it, what they had spent performing work of the value that it was. And the difference between the value of the work and the cost of doing that work is profit. There may have been other ways to, there may have been other methodologies, and if another had been adopted, I wonder whether we would have appealed it because it's an abuse of discretion issue. But 19% in this case was a reasonable profit on performing the work. And for those reasons, thank you. Thank you. We'll give you, if you need it, an extra three minutes added on to what you have remaining in light of the fact that the government went over. First of all, let me apologize to the court. If we had known Mr. Kobe was deceased, we would have never brought up the issue, and I guess I didn't know that until we heard it today. I'd like to start with Judge Reyna's question on mootness and AG attorney's fees, and it relates to the profit issue that Mr. McAmel raised last. The trial court made a specific finding that White Buffalo was entitled to a contract modification due to the design error on the slope. That's a 101 Fed claim at 17. Because White Buffalo was entitled to a contract modification, as White Buffalo requested in the 1999 case, we believe White Buffalo should have been designated a prevailing party in that case, which was not moot because it obtained relief that it requested that the contract be modified because of this error. That contract modification should have been, but wasn't, also incorporated into the court's profit calculation. What the court did on the profit issue is based on testimony of no witness. It was a calculation from the government's pretrial brief that wasn't sponsored by anyone. It wasn't presented by anyone. We never had an opportunity to cross-examine on it. But what it did was compare... Go ahead and finish the point, but I have a question. It compared alleged completion percentage by picking and choosing various things in the record and costs. If those numbers should have been adjusted due to the entitlement to a contract modification because of a design error that increased costs, then the profit calculation by the district court or the court of federal claims was incorrect. But you haven't raised that in your brief in this case, right? The contract modification issue that you're now addressing? I hope you did. Well, it may have been incorporated in some other argument, but I don't think there was a separate argument on this unless I'm just blanking on it. Well, I'll look for it, but why don't you go ahead. And that was a factual finding by the court, and it's inconsistent with the court's profit calculation. On the 12-month statute of limitations period, there's really no issue there. The bad faith claim was denied by the contracting officer in August 2007. White Buffalo filed suit to challenge it only three months later. So I guess I fail to see why there would be a 12-month statute of limitations issue there. On the merits of the bad faith claim, I guess I would just like to conclude by suggesting if the court was going to read one case, it would be the Keter decision tried in the court of federal claims about a year before ours, which were very similar factual circumstances where it wasn't the contracting officer, but it was the person feeding the contracting officer the information. Because, as in our case, the contracting officer is off somewhere else and relies on the on-the-ground person to provide information. And that evidence that the contracting officer had to rely on was biased in favor of, I think the words the court uses were, getting rid of a disfavored contractor to favor another contractor. And we believe those facts are highly analogous. Thank you. I thank both parties. The case is submitted.